PAUL FOLEY, Appellant, *v.* PRESS PUBLISHING COMBANY, Respondent.

First Department, June 7, 1929.

536

*Martin Conboy* of counsel [*David Asch* with him on the brief; *Griggs, Baldwin & Baldwin*, attorneys], for the appellant.

*Charles B. Brophy* of counsel [*Jackson, Fuller, Nash & Brophy*, attorneys], for the respondent.

PROSKAUER, J.   The appellant challenges the correctness of an order sustaining the sufficiency of separate defenses in an action for libel.

Prior to the publication of the articles in question, the airship Shenandoah of the United States Navy had met with a serious catastrophe resulting in the death of her commanding officer, Commander Lansdowne. There was consequent widespread criticism of the Navy Department. Particularly the widow of Commander Lansdowne charged that blame for the loss of the ship rested upon the Secretary of the Navy and other officials of the Navy Department in that they had directed the fatal flight at a time of year known to be unsafe by reason of weather conditions and in the face of the protest of the airship's commander. It was charged, indeed, that the Secretary of the Navy and his subordinates had ordered the flight without due regard to the safety of the ship and her crew and for the purpose of political profit to themselves and others. During the month of September, 1925, the Secretary of the Navy convened a court of inquiry, which was directed to investigate all the circumstances of the accident and to report whether in its opinion any offense had been committed or blame incurred. The plaintiff, an officer of the United States Navy and a personal aide to the Secretary of the Navy, was designated as judge advocate of the court of inquiry. Mrs. Lansdowne was invited to appear before the court of inquiry. She publicly charged that the plaintiff, prior to her appearance as a witness, had sought to induce her to give false testimony before the court of inquiry, to influence improperly her testimony as a witness and to cause her by either perversion or withholding of the truth unduly to favor the Secretary of the Navy and his subordinates. Thereupon the plaintiff was relieved of his duty as judge advocate, the court of inquiry purported to try the validity of Mrs. Lansdowne's charges against the plaintiff, and absolved him from blame. Thereafter, in the New York *World*, a daily paper, the defendant published the following editorial:

### "A Smelly Business.

" Let us stick to the point at issue in this Lansdowne inquiry. Let us not be diverted from that point by speculations as to how accurately Mrs. Lansdowne's aunt remembers what Mrs. Lansdowne's uncle said, and how accurately Mrs. Lansdowne's uncle remembers what Mrs. Lansdowne said, and how accurately Mrs. Lansdowne remembers what Capt. Foley said, and how accurately Capt. Foley remembers everything. Let us stick, instead, to facts about which there is no disagreement, has been no disagreement and can be no disagreement. For these facts are written in the record:

" 1. On the morning of Sept. 3 the airship Shenandoah was wrecked in an Ohio storm.

" 2. On the afternoon of Sept. 3, Mrs. Zachary Lansdowne, widow of the dead commander of the Shenandoah, told reporters that her husband had protested against the timing of the Shenandoah's flight on account of the danger of just such a storm.

" 3. On the same afternoon Secretary Wilbur denied the truth of Mrs. Lansdowne's statement. 'That is not correct,' he said, ' Commander Lansdowne was allowed to choose his time. His judgment was that it was safe to make the flight at this time.'

" 4. Six days later, on Sept. 9, Secretary Wilbur repeated and elaborated on this statement: ' Commander Lansdowne never protested against the flight in person or by communication to me or any one in the department, and, on the contrary, expressed his satisfaction with it to his superiors and associates.'

" 5. On Sept. 13 the correspondence between Commander Lansdowne and the Navy Department was made public before the Shenandoah court of inquiry.

" 6. This correspondence showed that Commander Lansdowne did emphatically protest against the timing of the Shenandoah's flight and filed his protest twice. His letters of protest are dated June 15 and Aug. 4.

" Secretary Wilbur was thus caught in what was either a plain lie or a culpable ignorance of facts, on the score of Lansdowne's protest. He was caught in a second lie or a second culpable ignorance of facts, on his statement that ' Lansdowne was allowed to choose his time.' For the court record shows (see the letter of the Acting Chief of Naval Operations, dated Aug. 12) that when Lansdowne asked for postponement of the flight to ' the second week in September,' back came the Navy Department's answer, ' Not approved.' And the reason given, in the department's words, was that by postponing his flight Lansdowne would be too late for five State fairs. Here were the political bureaucrats of the Navy playing with the lives of men.

" Let us see what happened next, with Secretary Wilbur caught either in a lie or in what Administration newspapers like the Herald Tribune called an ' unforgivable misrepresentation of the facts.'

" 1. Mrs. Lansdowne was due to testify in person before the Shenandoah court of inquiry on Oct. 9.

" 2. Two days before she was due to testify she received a visit from Capt. Paul Foley, technical aide to Secretary Wilbur, and Trial Judge Advocate of the Shenandoah court.

" 3. It is explained that this visit was simply in the nature

of a routine duty on Capt. Foley's part, since navy regulations require a Trial Judge Advocate to interview prospective witnesses before they testify, and discover what they propose to say. This is all very well, but the point is this: Do navy regulations also require Trial Judge Advocates to furnish prospective witnesses with canned versions of what the Navy Department would like to have them say?

" 4. On his own admission Capt. Foley furnished Mrs. Lansdowne with a ' statement.' And the crux of that statement, as Capt. Foley himself had reconstructed it, was that Mrs. Lansdowne no longer wished to testify and preferred to leave everything to Capt. Foley and his court.

" Capt. Foley, technical aide to Secretary Wilbur, had undertaken to do a little fixing.

" That is the Lansdowne story as it is written in the record. What it shows is, first, that the bureaucrats of the Navy Department seeking to make propaganda for dirigibles by taking advantage of State fairs, play politics with the Shenandoah. Disaster overtakes them. Then the Secretary of the Navy either tries to hide the facts or shows he does not know them. Then the facts come out. Then the widow of a dead naval officer intends to tell her story much too publicly, and an attempt is made to hush her up.

" How much longer, may we ask, does the President of the United States intend to wreck public confidence in the Navy Department by retaining at the department's head a man who first lies or blunders, then makes no apology for the blunder or the lie, and then permits his aides-de-camp to rig testimony for important witnesses?

" This whole affair, from the first statement of Mr. Wilbur on Sept. 3 to the present bullyragging tactics of more Navy Department bureaucrats who constitute a court of inquiry and seem to think it is their duty not to get at facts but to catch Mrs. Lansdowne in a quibble, smells to the high heavens. The sooner a Congressional Committee of investigation shakes the truth out of it the better for the navy."

This editorial constitutes the gravamen of the first cause of action.

In the second cause of action plaintiff realleges the preliminary facts hereinbefore set out and further pleads a second editorial which appeared in *The World:*

## " Too Much Whitewash.

" What set out to be an inquiry into the loss of the airship Shenandoah has ended in exoneration of Capt. Foley and an attempt

by the court of inquiry to put Mrs. Lansdowne in her place. By bestowing privileges upon one witness and withholding them from another witness, the gentlemen of the navy have come off with a gallant victory.

"This Naval Court of inquiry in Washington was convened for the express purpose of ascertaining ' the facts and circumstances surrounding the loss of the U. S. S. Shenandoah.' It met on Nov. 17 and promptly switched to a new issue. Having learned from the testimony of its first witness that Mrs. Lansdowne had accused Capt. Foley of attempting to influence her testimony, the court voted to make Capt. Foley a defendant in the action. The result was to drop the Shenandoah, take up Capt. Foley, and give Capt. Foley privileges which were denied to Mrs. Lansdowne. Capt. Foley, made a defendant, was permitted to be represented by counsel. Mrs. Lansdowne, being a mere witness, was not permitted to be represented by counsel. In fact, her counsel was ejected from the courtroom. Capt. Foley, being a defendant, was permitted through his lawyer to cross-examine Mrs. Lansdowne's witnesses. Mrs. Lansdowne was permitted to cross-examine nobody. Mrs. Lansdowne, on the contrary, was badgered for three hours by a hostile counsel and by a Judge Advocate who assured her that all he wanted to do was to bring out all the facts in the case, but whose conduct in the courtroom suggested that his chief wish was to catch Mrs. Lansdowne in a quibble. And in all this the facts and circumstances surrounding the loss of the Shenandoah, were forgotten.

"Let us see where we are now. Secretary Wilbur having said that Commander Lansdowne ' never protested against the [Shenandoah's] flight in person or by communication to me or any one in the department, ' and the record having proved that Commander Lansdowne did protest, and protest twice, was left a month ago in an unenviable position. His policy, thereupon, was not to confess error but stand pat. At this juncture, with Mrs. Lansdowne about to testify before the Shenandoah court and about to tell her story, the technical aide to Secretary Wilbur and the Judge Advocate of the court, Capt. Foley, went to Mrs. Lansdowne with a prepared statement which was to be given to the newspapers as coming from Mrs. Lansdowne, but which was actually written by this aide to Secretary Wilbur. The public, that is, was deliberately to be misled. In this statement Mrs. Lansdowne was to say that having thought things over she no longer wished to testify. What does it matter if Capt. Foley explains that this extraordinary action on his part was motivated solely by a desire to spare Mrs. Lansdowne the embarrassment of an appearance in the court? Capt. Foley would

have been better off if he had left the embarrassment to Mrs. Lansdowne and kept the legitimate duties of a Trial Judge Advocate for himself. On his own admission, an attempt was made to keep Mrs. Lansdowne off the stand. He was not successful. But the court did what it could to help him out. It voted itself a new piece of business, and that piece of business has been to whitewash the bureaucracy of the navy.

" Mrs. Lansdowne's counsel, pointing out that the court has constituted itself a tribunal to try a collateral matter which was not covered in its original instructions, and pointing out that in the course of what was ostensibly an inquiry into the loss of the Shenandoah, the court made a defendant of an officer who is under no charge of having the remotest connection with the loss of the Shenandoah, now asks Secretary Wilbur either to discharge the court of further duties or at least to recall its witnesses and give Mrs. Lansdowne the same privileges of cross examination which were enjoyed by Capt. Foley.

" In our judgment the affair has gone beyond a point where Secretary Wilbur can interfere successfully. It calls for a Congressional investigation."

The first defense purports to set up the truth of the statements contained in these two editorials. It is attacked on the claim that the justification is not as broad as the charge. The complaint is replete with allegations of innuendo. There is freely given the pleader's interpretation of such phrases as " to rig testimony," " had undertaken to do a little fixing," and " to whitewash." A jury may refuse to find these innuendos correct. The defense is broad enough to cover an interpretation of the editorials which a jury may reasonably place upon the meaning of the defamatory words. It is, therefore, sufficient. (*Morrison* v. *Smith*, 177 N. Y. 369; Newell Libel & Slander [4th ed.], § 546.) Without attempting to offset every statement of the editorials with the corresponding allegation in justification, we may by way of illustration place in juxtaposition the main defamatory statements and the facts set forth in the answer.

The editorial says: " * * * Do navy regulations also require Trial Judge Advocates to furnish prospective witnesses with canned versions of what the Navy Department would like to have them say? * * * On his own admission Capt. Foley furnished Mrs. Lansdowne with a ' statement.' And the crux of that statement * * * was that Mrs. Lansdowne no longer wished to testify and preferred to leave everything to Capt. Foley and his court. Capt. Foley, technical aide to Secretary Wilbur, had undertaken to do a little fixing. * * * Then the widow of a dead

naval officer intends to tell her story much too publicly, and an attempt is made to hush her up." Reference is then made to the fact that the Secretary of the Navy " permits his aides-de-camp to rig testimony for important witnesses." " Capt. Foley went to Mrs. Lansdowne with a prepared statement which was to be given to the newspapers as coming from Mrs. Lansdowne, but which was actually written by this aide to Secretary Wilbur. The public, that is, was deliberately to be misled." To meet this charge the defendant alleges in substance that Captain Foley did call on Mrs. Lansdowne; that he urged her not to testify orally, but to read a written statement; that in this connection he warned her that a naval board had all the powers of a Federal court and that she would have to testify truthfully; that Mrs. Lansdowne informed him that she proposed to testify that her husband had protested against the flight; that he thought it was a political movement and that she believed it had not been made clear by the court that under the orders given to him, her husband had been forced to make this flight, and that the Secretary of the Navy was in error when he said her husband had failed to protest; the " plaintiff * * * advised Mrs. Lansdowne not to make any statement as to the political aspects of said flight." This Mrs. Lansdowne refused to promise. She asserted that she would make her own statement in her own way. Thereafter the plaintiff dictated to a stenographer a statement intended to be read before the court by Mrs. Lansdowne; he directed the stenographer to destroy her note book. Only one copy of the statement was transcribed. In it he purported to have Mrs. Lansdowne say that she believed it to be her duty to say that her husband had been opposed to the flight, but that had she known when she was invited to appear in the court that all the correspondence in the Navy Department would have been introduced she would not have accepted the invitation of the Navy Department to appear, and that she had every confidence in the court. This statement, defendant alleges, was false, in that Mrs. Lansdowne did wish at all events to appear before the court and give oral testimony, and in that she did not have complete confidence in the court. It was incomplete in that it omitted all reference to Commander Lansdowne's charge made to his wife that the flight had been ordered for political purposes. It is undoubtedly true that this justification does not meet such an interpretation as that placed upon the libel by the appellant's brief to the effect that there was imported a charge of bribery against Captain Foley. But a jury might very reasonably find that there is no such meaning suggested in the editorial. If the statements of fact alleged in the justification are true, a jury may fairly conclude that they support

all statements contained in the editorials as a jury might fairly interpret them.

The second separate defense repeats and incorporates the allegations of fact contained in the first defense and couples them with further allegations that the matter discussed in these editorials was of great public importance, that the statements of fact contained in the editorials were true and the expressions of opinion therein are " fair comments made in good faith, without malice, upon the said facts which are matters of grave public interest and concern."

There have been references to the subject of fair comment in several opinions dealing with the sufficiency of complaints (*Duffy* v. *New York Evening Post Co.*, 109 App. Div. 471) and many general statements of the right of the public (including newspapers) to make reasonable and fair comment upon the conduct of public officers. (*Hoey* v. *New York Times Co.*, 138 App. Div. 149; *Howarth* v. *Barlow*, 113 id. 510, 513; *Bingham* v. *Gaynor*, 203 N. Y. 27, 32; *Hamilton* v. *Eno*, 81 id. 116, 127.)   There are other authorities dealing in general with the right of fair comment upon plays, books and the like.   (*Triggs* v. *Sun Printing & Pub. Assn.*, 179 N. Y. 144, 154.) But the nature and validity of this defense, called in the English authorities " the rolled-up plea," has received little consideration in the American authorities (Cf. *Sherman* v. *International Publications, Inc.*, 214 App. Div. 437, 444), though it has been many times and exhaustively considered in the courts of Great Britain and her colonies.   The purport of the plea is, that all the facts stated in the alleged libel are true, that there remains in the libel over and above all statements of fact certain expressions of opinion, which standing alone would be libelous, but that these expressions of opinion when related to the facts proved were fair comment and that, therefore, the expression of opinion was as fully justified as the statement of fact.

That this plea is difficult of interpretation and even more difficult of application to specific situations is apparent upon a reading of the English authorities.   In *Aga Khan* v. *Times Publishing Co.*, L. R. ([1924] 1 K. B. 675, 682) SCRUTTON, L. J., pointed out the difficulty of interpretation.   Speaking of the pleas of justification and fair comment, he said: " But unfortunately some thirty years ago the two pleas were apparently rolled into one, and since then there has been much difference of opinion in the Court of Appeal whether that rolled-up plea was a plea of justification coupled with a plea of fair comment, or was a plea of fair comment only."   The House of Lords soon thereafter had occasion to interpret this plea in *Sutherland* v. *Stopes* (L. R. [1925] App. Cas. 47).   They decided

that the rolled-up plea was a plea of fair comment only (pp. 62, 77, 99). The nature of the plea is thus stated by Viscount FINLAY (pp. 62–63): " There has been a good deal of misconception as to the nature of this plea. It has been sometimes treated as containing two separate defences rolled into one, but in fact raises only one defence, that being the defence of fair comment on matters of public interest. The averment that the facts were truly stated is merely to lay the necessary basis for the defence on the ground of fair comment. This averment is quite different from a plea of justification of a libel on the ground of truth, under which the defendant has to prove not only that the facts are truly stated but also that any comments upon them are correct."

*Sutherland* v. *Stopes* likewise illustrates the difficulty of applying the defense of fair comment to specific situations. There the Law Lords differed as to the exact application of this plea to the facts of the case under review, a majority holding the comment fair as a matter of law. Lord SHAW remarked that the law upon the subject of " what is relevant or required to establish a plea of fair comment * * * will, no doubt, demand early review." And yet, despite the practical difficulty of its application (*Sutherland* v. *Stopes, supra; Hunt* v. *Star Newspaper Co.*, L. R. [1908] 2 K. B. 309; *Dakhyl* v. *Labouchere*, id. 325), numerous authorities demonstrate conclusively that its validity has become a settled principle in the law of libel. (Gatley Libel & Slander [2d ed.], chap. 16, p. 368; Bower Defamation, 107; Ogders Libel & Slander [5th ed.], chap. 8; Newell Slander & Libel [4th ed.], chap. 17.) Occasional difficulty of application should not cause us to reject a principle based upon sound reasoning and justice in determination of a claim of libel with respect to public affairs.

In order that defeasible immunity may attach to a publication purporting to be fair comment cn a subject of public interest, it must be (1) a comment, (2) based on facts truly stated, (3) free from imputations of corrupt or dishonorable motives on the part of the person whose conduct is criticised, save in so far as such imputations are warranted by the facts truly stated, and (4) the honest expression of the writer's real opinion. (Gatley Libel & Slander, 371, 379; Bower Defamation, 114–117.)

The plaintiff in the case at bar contends that the expressions employed in the editorials are not comments, but false statements of fact, and that they are not entitled to immunity because they impute dishonorable and corrupt motives.

Factually, it is often difficult to distinguish between comment and statement of fact. As Lord WRENBURY remarked, " a libel may and generally does contain both statements of fact and state-

ments of opinion. * * * It is for the jury to say which of the statements are statements of fact and which are statements of opinion." (*Sutherland* v. *Stopes*, L. R. [1925] App. Cas. 47, 87.) FIELD, J., in *O'Brien* v. *Marquis of Salisbury*, ([1889] 54 J. P. 215, 216), made a similar observation: " Comment may sometimes consist in the statement of a fact, and may be held to be comment if the fact so stated appears to be a deduction or conclusion come to by the speaker from other facts stated or referred to by him. * * * If, although stated as a fact, it is preceded or accompanied by such other facts, and it can be reasonably based upon them the words may be reasonably regarded as comment, and comment only, and if honest and fair, excusable; and whether it is to be regarded as a fact or comment is a question for the jury, to be determined by them upon all the circumstances of the case."

Other authorities point out both the similarity and the distinction.

" An inference or comment may take the form of a statement of fact. The question is not whether the words which the defendant used stated a fact or not, but whether reading them in their environment the impression conveyed to the audience was that the defendant was merely making a bald statement that the deported men were criminals, or that that was an inference which the speaker thought should be drawn from certain facts which he mentioned or referred to." (BRISTOWE, J., in *Crawford* v. *Albu*, [1917] So. African L. R. [App. Div.], 102, 106.)

" If one states that a candidate is a thief, without qualification, he communicates a fact pertaining to his fitness; but it is a slander, if untrue, whether made in good faith or not, although, had he stated the exact facts, and expressed the opinion that they amounted to stealing, though they did not technically constitute the offense of larceny, the communication might be privileged." (HOOKER, J., in *Eikhoff* v. *Gilbert*, 124 Mich. 353, 360.)

And Gatley in his treatise on Libel and Slander (p. 373) thus clearly explains the distinction: " To write of a man that he is ' a disgrace to human nature ' is a defamatory allegation of fact. But if the words were, ' He murdered his father, and therefore is a disgrace to human nature,' it is clear from the context that the latter words are merely a comment on the former ones. So the context may show that the defendant, in alleging that a public man has been guilty of some disgraceful or dishonourable conduct, or has been actuated by corrupt or dishonourable motives, bases such allegations on facts which he truly states in the article complained of or clearly refers to therein. In such a case his allegations, if fairly warranted by the facts truly stated or referred to, may be defended as a comment on, or reasonable inference from, such

facts. It is a question for the jury to decide, subject to the direction of the judge, whether in the particular case the defendant's allegations are allegations of fact or expressions of opinion, and, if expressions of opinion, whether such expressions of opinion are fairly warranted by the facts truly stated or referred to." (See, also, Odgers Libel & Slander [5th ed.], 203; *Aga Khan* v. *Times Publishing Co.*, L. R. [1924] 1 K. B. 675, 680.) Here from the text of the libels, the circumstance that they were printed as editorials and not as news and the other relevant facts, a jury may determine what portions of the editorials were comment and what portions were statements of fact.

The plaintiff also insists that the plea of fair comment cannot avail this defendant because the editorials contain imputations of corruption or dishonorable motive; and there are undoubtedly authorities which suggest that " any imputation of wicked or corrupt motives is unquestionably libelous." (PARKE, B., in *Parmiter* v. *Coupland*, [1840] 6 M. & W. 105, 108; PATTESON, J., in *Cooper* v. *Lawson*, [1838] 8 A. & E. 746, 752; Folkard's Starkie Slander & Libel [3d ed.] p. 518; and cf. *Hamilton* v. *Eno*, 81 N. Y. 116, 127.) As early as 1863, however, COCKBURN, C. J., in *Campbell* v. *Spottiswoode* (3 B. & S. 769, 776) began to make the rule more flexible. " One man," he said, " has no right to impute to another, * * * base, sordid or wicked motives, unless there is so much ground for the imputation that a jury shall find not only that he had an honest belief in the truth of his statements, but that his belief was not without foundation." (*Hunter* v. *Sharpe*, 4 F. & F. 983, 1005, accord.) Odgers notes this change in the trend of authority. " Can it ever be ' fair comment,' " he asks, " to impute dishonorable motives to the person whose conduct is criticised? At first, the Courts held that such an inference could not possibly be a legitimate criticism on a public man. * * * Now, however, greater liberty prevails." (Odgers Libel & Slander [5th ed.], 222.) Although dicta still persist that an imputation of corrupt or dishonorable motive will render comment unfair (Cf. SCRUTTON, J., in *Homing Pigeon Co.* v. *Racing Pigeon Pub. Co.*, [1915] 29 T. L. R. 389), still the great weight of modern authority justifies the imputation as fair comment if it is " an inference which a fair-minded man might reasonably draw from such facts." (Gatley Libel & Slander, 383.) Thus VAUGHAN WILLIAMS, L. J., in *Joynt* v. *Cycle Trade Pub. Co.*, L. R. [1904] 2 K. B. 292, 297), remarked that " a criticism which contained such a suggestion could not be justified under the plea of fair comment, unless facts were proved which made it reasonable to make such a suggestion." This test was approved by COZENS-HARDY, M. R., in *Hunt* v. *Star Newspaper Co.* ([1908]

2 K. B. 309, 317), and BUCKLEY, L. J., in the same case said (at p. 323): " Comment which tends to prejudice may still be fair; it may convey imputations of bad motive so far as the facts truly stated justify such an imputation. It is for the jury to say whether the facts justify the imputation or not." Similarly Lord ATKINSON said in *Dakhyl* v. *Labouchere* (L. R. [1908] 2 K. B. 325, 329), " a personal attack may form part of a fair comment upon given facts truly stated if it be warranted by those facts — in other words, in my view, if it be a reasonable inference from those facts."

Again, in *Stevens* v. *British Medical Assn.* (Times, May 8, 1915, quoted by Gatley on Libel & Slander 386), SWINFEN EADY, L. J., laid down a similar test — " the question was whether on the facts truly stated the comment was fair and such as *could reasonably be made*." And in *Walker & Son* v. *Hodgson* (L. R. [1909] 1 K. B. 239, 253) BUCKLEY, L. J., said: " The defendant may nevertheless succeed upon his defense of fair comment, if he shows that that imputation of political bias, though defamatory, and although not proved to have been founded in truth, yet was an imputation in a matter of public interest, made fairly and *bona fide* as the honest expression of the opinion which the defendant held upon the facts truly stated, and was in the opinion warranted by the facts, in the sense that a fair-minded man might upon those facts *bona fide* hold that opinion." (See, also, cases cited by Gatley Libel & Slander, 387; *O'Brien* v. *Marquis of Salisbury*, [1889] 54 J. P. 215, 216; *Crawford* v. *Albu*, [1917] So. African L. R. [App. Div.] 102, 106.)

We concur in the principle enunciated by these authorities that the publication to be justified must contain no imputations of corruption or dishonorable motive, except in so far as they are an inference which a fair-minded man might reasonably draw from the facts truly stated and represent the honest opinion of the writer. If the imputations are thus inferable and honestly stated, the publication is justified. The mere circumstance that comments are exaggerated will not render them unfair. Nor is the defense destroyed by the circumstance that the jury may believe that the comment is logically unsound or in conflict with the opinion which the jury itself may entertain. It suffices that a reasonable man may honestly entertain such opinion on the facts found by the jury to be true, that the writer did so entertain it and expressed it without malice. And of course it is further requisite that the opinion be expressed as to some matter or person of public importance or interest, and that the imputation does not reflect upon the plaintiff save as the person concerned in or connected with the

particular conduct which constitutes the subject of the comment. (Bower Defamation, 114–117.)

Thus circumscribed, this defense preserves a fair balance between the social interest in free comment upon public affairs and the interest of the individual in the preservation of his good repute. The law, as worked out by the English authorities, affords both free scope to that fair discussion which " is essentially necessary to the truth of history and the advancement of science " (Lord ELLENBOROUGH in *Tabart* v. *Tipper*, [1808] 1 Camp. 350), and ample protection to the individual who dedicates his service to promote the public welfare. Thus limited, the law does not unduly hamper public discussion if it insists that only reasonable inferences be drawn from facts truly stated; it likewise protects the reputation of public servants by its insistence that opinions imputing dishonorable conduct be accompanied by facts truly stated, so that the public may draw its own conclusions as to the fairness of the comment. And finally it intrusts to the jury, drawn from the community itself, the duty and privilege of holding the scales between fair comment and unjustifiable defamation.

It is important to emphasize that this defense is not one of privilege. It is available to every one. (Lord ESHER, M. R., in *Merivale* v. *Carson*, [1887] 20 Q. B. Div. 275, 280; Gatley Libel & Slander, 369.) The lawyer writing his brief can insert a libelous statement therein, fair or unfair, without civil responsibility because the administration of justice requires such a rule of public policy. The employer, asked for references for a servant, enjoys an immunity with respect to what he may write by reason of the public policy growing out of the status and relationship of the parties. " Privilege " is limited to an individual who " stands in such relation to the circumstances that he would be justified in saying in writing what would be libelous or slanderous on the part of anyone else." (*Campbell* v. *Spottiswoode*, [1863] 32 L. J. N. S. [Q. B.] 185, 201.) But this defense of fair comment is not a privilege accorded solely to the press, but the right of every member of the community. " A newspaper has the right, and no greater or higher right, to make comment upon a public officer or person occupying a public situation than an ordinary citizen would have." (*Langlands* v. *Leng & Co., Ltd.*, [1916] S. C. [H. L.] 102, 110.)

Judged by these principles, the second defense here pleaded is sufficient. The libel in this case illustrates the sound reasons for the existence of the defense. Captain Foley's conduct is described in the title of the first editorial as " A Smelly Business." It is stated that he had " undertaken to do a little fixing," that he had been guilty of " bullyragging tactics," and that there was

" too much whitewash." The editorial sets forth as the facts which prompted the writer so to describe the conduct the attempt to dissuade Mrs. Lansdowne from giving oral testimony, the advice to her " not to make any statement as to the political aspects of said flight," the circumstances surrounding the preparation of the written statement intended to be read before the naval court by Mrs. Lansdowne, and the falsity of that prepared statement in material respects. The position of the defendant is that such statements as are clearly of fact are actually true; that the publication is an editorial, not a news story, and purports to state opinions as well as facts; that phrases such as " rigging testimony," " fixing," " too much whitewash," and " a smelly business," are fairly to be regarded as expressions of opinion; and that a jury may say that they reasonably characterize Captain Foley's conduct. We cannot say as a matter of law that such expressions are statements of fact, nor can we determine as matter of law that they are unfair comment upon the facts pleaded as true. A jury must decide these issues.

As a partial defense the defendant realleges its " rolled-up " plea. The validity of this defense is attacked on the ground that the defense is either incomplete or insufficient and that it cannot in its nature be a partial defense. We think it is clear, however, that where there are several distinct charges in a libel, it is competent for the defendant to justify some of them and for a jury to say that some of them are justified and some are not. It is proper, therefore, for the defendant to set up this plea as a partial defense to the end that if the jury finds it unsustained as a complete defense, it may none the less find it sufficient answer to some of the libels charged. (*Gressman* v. *Morning Journal Assn.*, 197 N. Y. 474; *Lanpher* v. *Clark*, 149 id. 472; *Farbenfabriken of Elberfeld Co.* v. *Beringer*, 158 Fed. 802.)

The so-called second separate and partial defense is really a defense in mitigation of punitive damages, and as such we sustain it. In it the defendant alleges that all the facts set forth in the foregoing defenses were communicated to it from reliable sources prior to the publication of the libels and that they in good faith relied on such communications without malice. The defendant has a right, by showing the truth of these allegations, to seek to escape the imposition of punitive damages or to reduce the amount thereof.

For these reasons the order appealed from should be affirmed, with ten dollars costs and disbursements.

DOWLING, P. J., MERRELL, FINCH and MCAVOY, JJ., concur.

Order affirmed, with ten dollars costs and disbursements.