Fuld, J.
(dissenting). No one may dispute or question the high necessity and great value of a publication alerting the public or an industry to the menace of Communism, or any other situation considered dangerous, and suggesting the means and method to combat it. The constitutional guarantee of free speech assures to defendants their right to speak out against such a danger, but, as the Constitution of this State explicitly declares (art. I, § 8), they are “ responsible for the abuse of that right ”. (See, also, Robertson v. Baldwin, 165 U. S. 275, 281.) The existence of danger does not, of course, suspend the law of libel. Indeed, as Professor Edmond Cahn has phrased it, “ civil remedies for defamation * * * were considered by the founding libertarians as virtually essential to the maintenance of free speech and press.” (Cahn, The Firstness of the First Amendment, 65 Yale L. J. 464, 476; see, also, 5 The Writings of Thomas Jefferson [1895], p. 112.)
As we read the challenged booklet, “ Red Channels,” and review the evidence, the conclusion is to our minds inescapable that the basic issues here presented — whether the published matter was defamatory of plaintiff and whether it was privileged as “ fair comment ” — are questions of fact for determination by a jury and may not be summarily disposed of by the court’s dismissal of the complaint.
Red Channels is a paper-backed booklet of some 200 pages, issued in June of 1950 by the publishers of “ Counterattack,” a weekly “Newsletter of Facts to Combat Communism”.. The text of the booklet is divided into three sections: an Introduction (pp. 1-7), an “Alphabetical Index of Names” (pp. 9-160) and an “ Alphabetical Index of Organizations ” (pp. 161-213). The introduction warns of the dangers of Communism and of the design of Communists to achieve control of the radio and television industry in order to further their purposes and facilitate their eventual seizure of the entire country. In analyzing the Communists’ strategy, the publication states that the number of actual party members in the industry is small, but that they pursue their goals by utilizing a great many “ dupes or innocents ” who, for one reason or another, support “the Party line ” (p. 2). These periphery workers are variously described as ‘ ‘ Communist sympathizers,” “fellow travelers,” “reliables,” “dupes,” “transmission belts ’ ’ and ‘ ‘ colonists; ’ ’ and the text emphasizes their impor *21 tance to the party, even though they may ‘ ‘ advance Communist objectives with complete unconsciousness ” (p. 6). The final section of the introduction, headed “ The Counterattack,” admonishes the industry that Communists and Communist sympathizers have no place on the air and compares them to “ the Lord Haw Haws, the Axis Sallys, and the Tokyo Roses ” (p. 6).
The two lists then follow. The first names 151 individuals and notes their activities in various organizations and in public affairs. The second, a catalogue of the organizations themselves, is headed by a note that, unless otherwise indicated, they are cited in a document prepared by the House Un-American Activities Committee as organizations found to be “ Communist or Communist Fronts ”.
Plaintiff’s name is contained in the first list; described as an “ Actor-Radio,” he is reported as (1) haying been a “ Speaker ” at a 1942 meeting of an organization cited by the House Un-American Activities Committee and (2) having attended a meeting in 1949 of an organization which urged the abolition of the House Un-American Activities Committee.
Plaintiff does not deny that he attended those two meetings. The gravamen of the complaint is that this listing, when read in conjunction with the title and introduction, was intended and calculated to convey to the public that plaintiff ‘ ‘ was and is connected with the Communist Party, either as a ‘ Communist,’ ‘ dupe,’ ‘ tool,’ ‘ sucker,’ ‘ colonist,’ ” etc.; and that ‘ ‘ he was and is sympathetic to the cause of Communism ”, exerting “ his influence in radio or television by promoting pro-Soviet, pro-Communist, anti-American ” propaganda. Maintaining that defendants acted “ maliciously ” in publishing the statement concerning him, plaintiff denies that he is or ever was a Communist, Communist sympathizer or any of the other things mentioned and asserts that the published matter was false, that it held him up to public ridicule and contempt, hurt his standing in the community and impaired his opportunities to obtain employment in his chosen field.
Plaintiff’s evidence established that, from 1947 until the publication of the booklet in 1950, his earnings averaged about $17,000 each year, and that they fell thereafter to $11,878 in 1951, to $6,710 in 1952 and to $1,630 in 1953. He was antiCommunist, he testified, had played the leading role in an *22 anti-Communist radio play in 1948 and had never, to his knowledge, been associated in any way with Communism or any Communist front. The 1942 meeting that he attended was called to urge the opening of a second front in Europe and his participation consisted of reciting a roll call, in verse, of “ various artists who died in the struggle against Fascism.” He attended the 1949 meeting, he stated, ‘ ‘ largely out of curiosity,” and also because he was opposed to the House Un-American Activities Committee and its practices.
One witness, an actor, testified that he and others in the industry had shunned and avoided plaintiff as a result of the inclusion of his name in Red Channels. He had not, he asserted on cross-examination, read the book carefully, but, “ like all [his] friends,” he had “ jumped to the conclusion ” that plaintiff was a Communist solely because he was listed. And a producer for the Columbia Broadcasting System stated that there was a ‘ ‘ widespread ’ ’ custom in the radio and television industry not to hire anyone listed in Red Channels, explaining that “We quarantine everybody in the book. We cannot take any chances.” On the other hand, several witnesses, when asked by the trial court whether plaintiff “has been avoided and shunned by former friends and acquaintances ” as a “ direct ” result of being listed in Red Channels, gave inconclusive answers. One stated, “Not of my own knowledge”, another had “no knowledge that that has happened ” and a third declared, “ I could not say that of my own personal knowledge * * * because I don’t have that close a contact.”
It is defendants ’ principal contention that nothing defamatory has been published “ of and concerning ” plaintiff. They maintain that the only reference to him is in the Index and that he concedes the substantial truth of the statements about his participation in the two meetings. They acknowledge that the introduction warns of the “fellow travelers,” “dupes” and “ reliables,” who are advancing Communist aims, and that its message is that they should be kept off the air. But, they urge, it does not specify which, if any, of the individuals listed come within these categories and, indeed, cautions that some “ advance Communist objectives with complete unconsciousness ”. Therefore, the argument concludes, since the booklet affords no indication whether or not plaintiff is in one *23 of the objectionable classes, the alleged defamatory matter cannot be applied to him.
In making these arguments, however, defendants overlook cardinal principles in the law of libel. They ignore the rule that the publication must be considered as a whole, that its meaning depends, not upon isolated and detached statements, but upon “ ‘ the whole scope and apparent object of the writer.’ ” (More v. Bennett, 48 N. Y. 472, 476; see McKee v. Robert, 197 App. Div. 842, 847; see, also, Seelman, Law of Libel in New York, par. 160, p. 138.) They also ignore, what is of equal significance, that “ the courts will not strain to interpret [the words used] in their mildest and most inoffensive sense to hold them nonlibelous. ” (Mencher v. Chesley, 297 N. Y. 94, 99.) The writing must be “ read against the background of its issuance, under the circumstances of its publication ” (Mencher v. Chesley, supra, 297. N. Y. 94, 99) and construed, not with the high degree of precision expected of and used by lawyers and judges, but as it would be read and understood by an ordinary member of the public to whom it is directed. (See, e.g., Sydney v. Macfadden Newspaper Pub. Corp., 242 N. Y. 208, 214; Cafferty v. Southern Tier Pub. Co., 226 N. Y. 87, 93; see, also, Seelman, op. cit., pars. 162-164, pp. 139-142; Prosser on Torts [2d ed., 1955], § 92, pp. 580-581.)
With these principles in mind, let us examine Red Channels. Its “whole scope and apparent object” (More v. Bennett, supra, 48 N. Y. 472, 476) was to call the attention of the radio and television industry to the dangers of Communist infiltration and to recommend as a “ Counterattack ’ ’ that work be refused to those performers who might promote and further that cause. Self-styled “ The Report of Communist Influence in Radio and Television ”, its cover luridly emblazoned with a large red hand about to cover and smother a microphone, the booklet warns that the Communist scheme is being advanced by a great many people within the ranks of the entertainment field. It describes in considerable detail how the Communist sympathizers, the Communist dupes, colonists and tools aid the Communists by mouthing the party line, by linking their names or contributing money to front organizations or — remarking an activity which has particular reference to plaintiff — by lending their ‘ ‘ great prestige and crowd-gathering power * * * as performers or speakers at front meetings and rallies ” (p. 1). And it *24 urges and advises, as a “ Counterattack,” that the danger of eventual Communist domination of the industry should “ guide broadcasting management in the screening of personnel ” (p. 6).
Then, in what constitutes the major portion of the book, it lists performers who have become members or sponsors of front organizations, or participated in their rallies, who have, in short, engaged in the very activities cited as abetting the Communist program of infiltration and domination. This list appears to be the prime reason for the booklet’s existence, and it is certainly a reasonable inference for the “ fair reader ” that these are the “ sympathizers,” the “ dupes ” and the “ tools ”, that these are the people who must be kept off the air, blacklisted and quarantined, if the Communist plan is to be disrupted, its goal frustrated. That this was in fact the understanding of broadcast management is a matter of evidence in the record before us.
The mere statement in the introduction that, ‘ ‘ In screening personnel, every safeguard must be used to protect innocents and genuine liberals ”, cannot shield defendants from liability if the booklet is otherwise libelous. Actually, it is unclear whether this note of caution was meant to apply to the persons listed or only to other personnel. But, even if it clearly embraced those named, it would not serve, per se, to insulate defendants from liability. The publisher of an otherwise libelous report obviously cannot escape liability by so simple and obvious a subterfuge, and so we have already, and clearly, held in Brown v. Tregoe (236 N. Y. 497).[1]
*25 As reason and decision make plain, a publisher may not brand his victim with suspicion and then avoid liability by attempting to foist upon the reader the burden and responsibility of ascertaining whether or not there is anything to the charge. Human nature being what it is, and time usually at a premium in this machine age of ours, a writer or publisher may reasonably expect a reader to act upon the suspicion rather than to undertake an independent investigation of his own. Indeed, as a producer for one large network testified, the industry adopted the policy of “ quarantining ” everyone listed in Red Channels and followed the practice of not hiring any of them. Even if defendants did not intend this precise consequence, the law holds them responsible for “ the natural and proximate result of their act”; they may not “ escape liability by * # * indirectly charging that which would be slanderous, if imputed in direct and undisguised language.” (Sanderson v. Caldwell, 45 N. Y. 398, 401, 404; see, also, Spiegel, Defamation by Implication — in the Confidential Manner, 29 So. Cal. L. R. 306.)
If, as argued, there was a question as to the accuracy of the witnesses’ appraisal of the book’s impact, it was at least a matter for the jury’s consideration and determination.
Nor may it be held that the publication was rendered non-actionable as a matter of law by the insertion of scattered statements in the introduction and the headnote to the Index, that some performers who engaged in the activities mentioned may not “ actually believe in, sympathize with, or even recognize the cause advanced ”, and may really be “ innocents ” or “ genuine liberals ”. Where, as here, the general tenor of the publication is such that it may be fairly read as casting a high degree of suspicion on every one of the persons listed, the mere suggestion that “ some ” of those named may not fall within the objectionable category cannot suffice, per se, to shield defendants from liability. (See, e.g., Kirkman v. Westchester Newspapers, 287 N. Y. 373, 379, 385; Neiman-Marcus v. Lait, 13 F. R. D. 311, 315; see, also, Restatement, Torts, § 564, Comment c, illus. 2; Horowitz, Legal Aspects of “Political Black Listing ” in the Entertainment Industry, 29 So. Cal. L. R. 263, 283-285.) Moreover, it cannot be assumed that the laymen of the broadcasting industry who read the booklet would underscore these scattered statements, as we have done, and consider their relative weight and import. It is settled that such “ detached statements *26 cannot be set aside to destroy the connection of the whole ” (McKee v. Robert, supra, 197 App. Div. 842, 847) and that “ an undue emphasis may be given a part of the publication,” such as the title, cover and most of the introduction of Bed Channels, which less prominently placed qualifying statements cannot remedy. (Prosser, op. cit., § 92, p. 581; see, also, Shubert v. Variety, Inc., 221 App. Div. 856, affg. 128 Misc. 428; Newell on Slander and Libel [3d ed., 1914], § 368, p. 378.)
Furthermore, there is nothing in the booklet to indicate that a performer who assists and advances the Communist cause unknowingly, without recognizing that he is doing so, merits any better industry treatment than one who is actually a member of the Communist party, knowingly and deliberately participating in its program and purposefully furthering its aims. Thus, the authors expressly assert that “ The ‘ colonists ’ need not be party members or even deliberate cooperators. It is sufficient if they advance Communist objectives with complete unconsciousness.” It is plain from what defendants have written in the introduction that it is the activity — mouthing Communist propaganda, lending prestige to the Communist cause or to front organizations — that is charged with assisting the Communists and thereby endangering the industry. Whether such activity is engaged in consciously or not obviously makes no difference, and the fact that the participation is unwitting would not lessen its impact on radio producers. The charge still remains that the particular performer, regardless of intent or motive, furthers the Communist plan by words and actions and, therefore, must be stilled, must be “ quarantined and ” removed from the roster of employable artists.
Defendants assume that a charge so qualified is not defamatory. But considering “ the temper of the times ” and the “ current of contemporary public opinion ” (Mencher v. Chesley, supra, 297 N. Y. 94, 100), the ignorance, the gullibility, the lack of common care or good sense involved in being inveigled into serving the Communists and their cause, even unwittingly, might ■reasonably be said to hold the victim up to public shame, scorn and ridicule. (Cf. Spanel v. Pegler, 160 F. 2d 619; Grant v. Reader’s Digest Assn., 151 F. 2d 733, 735.)
Quite apart from all this, however, the particular circumstances of this ease bring into play a much stricter standard of liability. The charge here in question was made of a *27 radio and television performer in a booklet directed to management to be used as a guide in screening personnel. It was made as a judgment on Ms fitness for employment, for tbe message of the booklet is that performers who assist the Communist cause have no place on the air. Under such conditions, it is of no moment that the charge may exonerate him of any conscious fault; the law renders the words actionable, as calculated to impair his ability to earn a livelihood, though it contain not the slightest imputation against his honesty, his motives or his character. (See, e.g., Kleeberg v. Sipser, 265 N. Y. 87, 91-92; Braun v. Armour & Co., 254 N. Y. 514; Hoeppner v. Dunkirk, Print. Co., 254 N. Y. 95, 105-106; Ben-Oliel v. Press Pub. Co., 251 N. Y. 250, 255-256; Brown v. Tregoe, supra, 236 N. Y. 497; Bornmann v. Star Co., 174 N. Y. 212, 219; Krug v. Pitass, 162 N. Y. 154, 159-160; Moore v. Francis, 121 N. Y. 199; see, also, Prosser, op. cit., § 93, p. 590; Seelman, op. cit., pars. 19-21, pp. 8-13.)
It is sufficient, this court decided in Moore v. Francis (supra, 121 N. Y. 199, 205), if the words impute to him any “ incapacity, unfitness or want of any necessary qualification ” in the exercise of his profession, trade or business. In the Moore case (supra, 121 N. Y. 199), the accusation was that the plaintiff, a bank teller, had become mentally deranged from overwork, and had made injurious statements which caused a run on the bank. The court, after stating the general rule quoted above, found the charge actionable as tending to harm him in Ms occupation as a bank teller: “ The publication now in question * * * imputed mental derangement while engaged in Ms business as teller, which affected him in the discharge of his duties. The words conveyed no imputation upon the plaintiff’s honesty, fidelity or general capacity. * * # While the statement was calculated to excite sympathy, and even respect for the plaintiff, it nevertheless was calculated also to injure him in his character and employment as a teller ” (p. 206).
Similarly, in this case, the charge that plaintiff was a ‘ ‘ dupe ’ ’ or “ colonist ’ ’ of the Communists was written in relation to his profession as a radio and television actor. It imputed the want of a “necessary qualification in the exercise thereof”, for the book’s entire thesis is that such peripheral Communist workers should not be employed because they undermine and prostitute American broadcasting and pave the way for *28 eventual Communist seizure of that industry. Defendants, in other words, expressly connected the charge with plaintiff’s trade and occupation; they themselves made it a necessary qualification in the exercise thereof. And, as demonstrated above, the publication is not rendered any less libelous by the suggestion that plaintiff may have been innocently inveigled into advancing Communist objectives “with complete unconsciousness.” To cull from the opinion in the Moore case (supra, 121 N. Y., at p. 206), although the statement may have “ conveyed no imputation upon the plaintiff’s honesty, fidelity or general capacity”, it was, nevertheless, “calculated * * * to injure him in his character and employment ” as a radio and television entertainer.
Our decision in Hays v. American Defense Soc. (252 N. Y. 266) is not here apposite. That case concerned a pamphlet, entitled “LaFollette — Socialism — Communism”, which was solely political in its purpose, namely, to defeat LaFollette in his candidacy for president and to stimulate ‘ ‘ an active interest in combatting the growth of radicalism in this country ” (p. 270). The text described three classes of organizations: first, the Communists, ‘ ‘ who are endeavoring to overthrow the government by force ”; second, a group of named organizations which “ clearly understand * * # that their purpose and activities are in aid of the Communist party ’ ’; and, third, two organizations, to all appearances “ perfectly legitimate,” which assisted the second group by means of “interlocking directorates ” (pp. 270-271, 276). Plaintiff’s name was nowhere mentioned in the text of the pamphlet; it appeared only in a list of 396 names contained in an index in the back of the ^pamphlet, with symbols indicating that he was a person “connected with” the two organizations of the third group. He was not, however, identified with any of the organizations in the first two groups. As respects the organizations with which he was affiliated, the pamphlet did charge that “ certain ” of the directors of those organizations were “Reds or Radicals ” and that “ certain ” of the persons interested therein were “ adepts ” or “ dupes ” of the Communists (p. 274). We held that the pamphlet could not be read as charging that all of the directors or members of the organizations with which plaintiff was associated were ‘ ‘ Reds or Radicals ’ ’ or “ adepts ” or “ dupes ”, and that, accordingly, there was no *29 basis for the claim that the defamatory statements in the pamphlet were made “ of and concerning ” the plaintiff.
In the case before us, however, a jury could reasonably find that the publication charged, or at least generated a high degree of suspicion, that everyone of those named was an “ adept ” or a “ dupe ”, aiding and abetting the Communist cause. Moreover, the pamphlet in the Hays case was, first and last, a political tract, the list of names being but incidental, entirely different from the purpose of the list in Red Channels. As already noted, the latter booklet is a report to the broadcasting industry on the fitness for employment of the persons listed, and the list, along with the advice that those who aid or abet the Communists should be refused employment, was the principal reason for its issuance. In such circumstances, the statements purporting to exculpate some of those listed as unknowing or unwitting participants are irrelevant to its defamatory nature, for the charge that plaintiff advances the Communist cause, whether knowingly or not, is in itself actionable as defaming and disparaging him in his trade or profession.
It is our conclusion, therefore, that a fair question was presented for the jury as to whether Red Channels charges plaintiff, as is alleged in the complaint, with being a “ dupe,” “colonist,” “transmission belt,” of the Communist cause, “ exerting * * * his influence in radio or television by promoting pro-Soviet, pro-Communist, anti-American ’ ’ propaganda. Whether or not that charge is true, is a matter for defense, not to be decided on a motion to dismiss the complaint. Nor can we agree, as the trial court ruled, that the evidence conclusively established that plaintiff was in no way injured. Again, the question was, at best, one of fact for determination by a jury, and could not be summarily disposed of as a matter of law by the court. On a motion to dismiss, the facts must “ be considered in the aspect most favorable ” to the plaintiff, who is ‘ ‘ entitled to the benefit of every favorable inference which can reasonably be drawn from those facts. ’ ’ (Sagorsky v. Malyon, 307 N. Y. 584, 586.) The publication itself and the evidence, particularly the undisputed showing of the drastic decrease in plaintiff’s earnings and the testimony that he was shunned and avoided and refused jobs because of the industry’s widespread practice of not hiring anyone listed in Red Channels, were certainly ample to create an issue of fact for the *30 jury.[2] In any event, proof of lack of injury furnishes no ground for dismissing a libel action, in view of the fundamental principle that the existence of some damage, at least nominal damage, is always presumed from the publication of the libel itself. (See, e. g., Abell v. Cornwall Ind. Corp., 241 N. Y. 327, 335; Moore v. Francis, supra, 121 N. Y. 199, 204; Sanderson v. Caldwell, supra, 45 N. Y. 398, 403; see, also, Seelman, op. cit., pars. 332, 337-339, pp. 323-324, 326; Prosser, op. cit., § 93, p. 587.)
There remains for consideration defendants’ reliance on the qualified privilege of fair comment, as an alternative ground for dismissal of the complaint.
The privilege is recognized of commenting on matters of public interest and concern, provided that (1) the published statement is a matter of ‘1 comment or opinion ’ ’ rather than the assertion of a factual proposition, (2) it is based on facts truly stated, (3) it is a fair and reasonable inference from those facts and (4) it is made without actual malice, by which is meant “ personal spite or ill will, or culpable recklessness or negligence.” (Hoeppner v. Dunkirk Print. Co., supra, 254 N. Y. 95, 106; see, also, Briarcliff Lodge Hotel v. Citizen Sentinel Publishers, 260 N. Y. 106, 118-119; Triggs v. Sun Print. & Pub. Assn., 179 N. Y. 144, 154-155; Foley v. Press Pub. Co., 226 App. Div. 535; Seelman, op. cit., § 246, pp. 233-235.) Perhaps, in a *31 rare and exceptional case, the defense of fair comment may be established as a matter of law, bnt it is settled that, if any question is raised as to whether the published statement is one of fact rather than an expression of opinion, or whether, if opinion, it is fairly warranted by the facts truly stated or whether the defendant has otherwise gone beyond the bounds of fair comment, the matter must be submitted to the jury. (See Triggs v. Sun Print. & Pub. Assn., supra, 179 N. Y. 144, 154; Foley v. Press Pub. Co., supra, 226 App. Div. 535, 546; Aga Khan v. Times Pub. Co., L. R. [1924] 1 K. B. 675, 680; Gatley on Libel and Slander [4th ed., 1953], p. 369; Odgers on Libel and Slander [5th ed., 1911], pp. 218-220.)
In the present case, it certainly may not be held that the defense of fair comment has been made out as a matter of law. In the first place, the whole tenor of the booklet, its plain implication, is that of a factual report compiled by a research bureau whose business it is to make such reports. Everything that is said, both in the introduction and in the body of the work, is fully documented, little being asserted in the form of opinion or comment. And, even if the statements were deemed “ comment,” a substantial question is presented as to whether it is “ fair ”, that is, whether it could be fairly inferred, from plaintiff’s participation in the two meetings cited under his name, that he is a “ sympathizer ”ora“ tool ”ora“ dupe ” of the Communists, and a threat to American broadcasting. There is also the further question, for the jury, whether defendants have gone beyond the area of fair comment to launch a personal attack upon plaintiff. (See Triggs v. Sun Print. & Pub. Assn., supra, 179 N. Y. 144, 154, 156.)
The evidence, in addition, raises a question of fact as to whether defendants were guilty of such recklessness, the equivalent of actual malice, in making the defamatory statements concerning the plaintiff, as to preclude invocation of the privilege of fair comment. (See Hoeppner v. Dunkirk Print. Co., supra, 254 N. Y. 95, 106; Pecue v. West, 233 N. Y. 316, 322.) Thus, one witness, a free lance writer, who interviewed defendants for the purpose of writing an article about Eed Channels, testified that defendant Bierly told him that two mistakes had been made in publishing Eed Channels: “We did not”, he is quoted as saying, “check up on the accuracy of the so-called facts before they were pub *32 lished”; and they “didn’t grade” the people or “indicate [which] was a Communist, a dupe or an innocent.” And, the witness added, Bierly stated that, “asa consequence, a person reading it would look at it and say, — whether by bias or ignorance or whatever — ‘ Oh, oh, that guy must be a Commy ’ ”.
Therein lies the potential for harm which inheres in defendants’ publication. Just as had individuals in the industry, so may a jury reasonably find that the booklet, considered as a whole, charges plaintiff with being a Communist sympathizer, a Communist tool or a Communist dupe, and, by reason thereof, defames and disparages him in his business and profession. Defendants are, of course, free to show, if they can, that plaintiff was in truth and fact a Communist sympathizer, tool or dupe, and, if the jury were so to find, there would be no liability. Or, if the jury were to determine that what defendants said of plaintiff constituted not a statement of fact but an opinion, and that that opinion was honestly expressed and was a permissible deduction and inference from the facts truly stated, the defense of fair comment would be established and, again there would be no liability. However, as already demonstrated, doubtful questions of fact are presented and the complaint should not have been dismissed. Just as a court may not shirk its duty by creating an issue, “ when none exists ”, so, we have declared, a court violates first principles if, as here, it disregards an issue and thereby deprives a plaintiff of a trial by jury. (Crane v. New York World Tel. Corp., 308 N. Y. 470, 479-480.)
The judgments should be reversed and a new trial ordered, with costs to abide the event.
Conway, Ch. J., Dye, Froessel and Van Vooehis, JJ., concur with Burke, J.; Fuld, J., dissents in an opinion in which Desmond, J., concurs.
Judgment affirmed, with costs.

. The Brown case (supra, 236 N. Y. 497) involved a charge couched in language very similar to that used here. Defendants, a credit and collection agency, published a report concerning plaintiff, a competitor in the same business, which stated that “The information derived by our investigator •t- » * indicated ” that his [plaintiff’s] former employer was “ very critical,” and “ tended also to criticize [his] paying qualities ” and suggested that he had been guilty of “ungentlemanly practices”. It cautioned not only that this “was merely information coming into the hands of our investigator, and we have no means at all of verifying or disapproving it,” but also that, “In our judgment * * * prospective users of [plaintiff’s] agency should satisfy themselves thoroughly as to its abilities and the character of the men back of it.” Despite this statement, the court explicitly concluded that “a jury at least would be permitted to say” that the report accused plaintiff of poor “paying qualities” and other faults, which “undoubtedly would impair his standing and character in his business” (236 N. Y. 497, 501, 502).

. In point of fact, testimony designed to show that a witness believed that plaintiff’s reputation was not injured should not have been admitted. (See Linehan v. Nelson, 197 N. Y. 482; Maynard v. Beardsley, 7 Wend. 560, 568-569, affg. 4 Wend. 336, 359; Van Vechten v. Hopkins, 5 Johns. 211, 225-226; see, also, Seelman, op. cit., par. 565, p. 485; par. 573, p. 488.) Reliance on Bishop v. New York Times Co. (233 N. Y. 446) for its receipt is misplaced. In the Bishop ease, the court held that the plaintiff may support “the presumption of injury to reputation and mental distress ” by introducing “ evidence tending actually to prove such consequences ” (pp. 453-454). It has no bearing, however, on the question whether testimony to the contrary — that is, testimony that the witness believes plaintiff’s reputation unharmed — is admissible. On that question, we expressly held in Linehan v. Nelson (supra, 197 N. Y. 482) that a defendant may not ask plaintiff’s witnesses upon cross-examination “ whether the * * * [publication] had injured the reputation of the plaintiff in the estimation of the witness ” (p. 484). It would, the court observed, introduce “ a new element of speculation and uncertainty ” and might lead to the defeat of a libel action simply because the plaintiff was too highly regarded to suffer any loss of esteem or the defendant too poorly regarded for his accusation to be believed (pp. 485-486).