KARL HOEPPNER, Respondent, *v.* THE DUNKIRK PRINTING COMPANY, Appellant. (Actions 1 and 2.)

(Argued May 9, 1930; decided June 3, 1930.)

*Glenn W. Woodin* for appellant. The articles are clearly not libelous *per se;* on the contrary, they are only fair and honest comments upon matters of public interest. (*Morrison* v. *Smith,* 177 N. Y. 366; *Triggs* v. *Sun Assn.,* 179 N. Y. 144; *Fleischmann* v. *Bennett,* 87 N. Y. 231; *Siegel* v. *Sun Assn.,* 130 Misc. Rep. 18; *Hills* v. *Press Co.,* 122 Misc. Rep. 212; *Keating* v. *Conviser,* 127 Misc. Rep. 531; *Baumann* v. *Baumann,* 250 N. Y. 382; *Atkinson* v. *Doherty & Co.,* 121 Mich. 372; *Church* v. *Tribune Assn.,* 135 App. Div. 30; *Tower* v. *Crosby,* 214 App. Div. 392; *Thorner* v. *Samuels,* 122 Misc. Rep. 139; *Cohen* v. *N. Y. Times Co.,* 153 App. Div. 242; *Mattice* v. *Wilcox,* 147 N. Y. 624; *Krug* v. *Pitass,* 162 N. Y. 154; *Moore* v. *Francis,* 121 N. Y. 199; *Cruikshank* v. *Gordon,* 118 N. Y.

178.) No personal attack of any character has been made upon the plaintiff himself. (*Hayes* v. *American Defense Society*, 252 N. Y. 266; *O'Connell* v. *Press Pub. Co.*, 214 N. Y. 352; *Reporters Assn.* v. *Sun Printing & Pub. Assn.*, 186 N. Y. 437; *Crashley* v. *Press Pub. Co.*, 179 N. Y. 27; *Marlin* v. *Shields*, 171 N. Y. 384; *Hemmens* v. *Nelson*, 138 N. Y. 517; *Fleischmann* v. *Bennett*, 87 N. Y. 231; *Kloor* v. *N. Y. Herald Co.*, 200 App. Div. 90; *Rossiter* v. *N. Y. Press Co.*, 141 App. Div. 339; *Tower* v. *Crosby*, 214 App. Div. 392; *Twiggar* v. *Ossining Printing & Pub. Co.*, 161 App. Div. 718; *Barringer* v. *Sun Printing & Pub. Assn.*, 160 App. Div. 691; *Perley* v. *Morning Telegraph Co.*, 131 App. Div. 599; *Outcault* v. *New York Herald Co.*, 117 App. Div. 534; *Walker* v. *Best*, 107 App. Div. 304; *Ratzel* v. *New York News Pub. Co.*, 67 App. Div. 599; *Battersby* v. *Collier*, 34 App. Div. 347.) Publication of the articles in question is fully protected as fair comment and criticism of matters of public concern. (*Beardsley* v. *Kilmer*, 236 N. Y. 80; *Marlin Fire Ins. Co.* v. *Shields*, 171 N. Y. 384; *Corrigan* v. *Bobbs-Merrill Co.*, 228 N. Y. 58; *Carroll Corp.* v. *Greenberg, Inc.*, 216 App. Div. 268; *Keating* v. *Conviser*, 127 Misc. Rep. 531; *Schwimmer* v. *Commercial Newspaper Co.*, 131 Misc. Rep. 552; *Foley* v. *Press Pub. Co.*, 226 App. Div. 535; *Cortright* v. *Anderson*, 208 App. Div. 1; *Philipp Co.* v. *New Yorker Staats-Zeitung*, 165 App. Div. 377; *Outcault* v. *N. Y. Herald Co.*, 117 App. Div. 534; *Battersby* v. *Collier*, 34 App. Div. 347.)

*Anthony Johnson* for respondent. The defense of privilege cannot prevail. (*Richardson* v. *Gunby*, 42 L. R. A. 520; *Mattice* v. *Wilcox*, 24 N. Y. Supp. 1060; 147 N. Y. 624; *Sherman* v. *International Publications*, 212 N. Y. Supp. 484; *Bingham* v. *Zaynor*, 126 N. Y. Supp. 312; *Houston Press Co.* v. *Smith*, 3 S. W. Rep. [2d] 900; *Jenkens* v. *Taylor*, 4 S. W. Rep. [2d] 656; *Eisenberg* v. *Reasenberg*, 133 Misc. Rep. 190; *Foley* v. *Press Pub. Co.*, 226 App. Div. 535; *Foley* v. *New York Evening Journal*, 226 App. Div.

550.) The articles in both actions are libelous *per se.* (*Vial* v. *Larson,* 109 N. W. Rep. 1007; *Montgomery* v. *New Era Printing Co.,* 229 Penn. St. 165; *Moore* v. *Francis,* 121 N. Y. 199; *Cruikshank* v. *Gordon,* 118 N. Y. 178; *Krug* v. *Pitass,* 162 N. Y. 154; *Triggs* v. *Sun Printing & Publishing Assn.,* 179 N. Y. 144; *d'Altomonte* v. *New York Herald Co.,* 154 App. Div. 453; 208 N. Y. 596; *Sanderson* v. *Caldwell,* 45 N. Y. 398.) Criticism of a public or professional man is not privileged where actual malice is shown or charge is ground for removal. (*Houston Press Co.* v. *Smith,* 3 S. W. Rep. 900; *Schlesinger* v. *Schultz,* 96 N. Y. Supp. 30; *Triggs* v. *Sun Printing & Publishing Assn.,* 179 N. Y. 144; *Phelan* v. *Rheinstein,* 133 Misc. Rep. 853; *Ben-Oliel* v. *Press Pub. Co.,* 217 App. Div. 743; 251 N. Y. 250.)

CRANE, J. The Dunkirk High School of the city of Dunkirk, county of Chautauqua, has a football team which during the football season plays in competition with the teams of other high schools and preparatory institutions. In 1928 the team met with certain reverses which touched the pride of local admirers. The playing of the team was severely criticized by the Dunkirk *Evening Observer,* published by the defendant, a paper having considerable circulation throughout the State. Plaintiff was the teacher in physical education in the Dunkirk High School, and the head coach of the team. What the *Observer* said about the team was taken by the plaintiff as a reflection upon his ability as a coach, and he thereupon brought actions for libel.

The number of pages devoted to sports in the daily issues of all our newspapers gives some idea of the keen interest which the public takes in these affairs. Any one who has attended a college baseball or football game has experienced the keen enjoyment and satisfaction which the spectators take in shouting advice and criticism to the players. It is impossible to disassociate a sport contest

of any magnitude from public criticism, hero worship and excuses for defeat. The chief reason why sports make an appeal to the American public is because they afford an outlet for pent-up feelings and enthusiasm. Sport is the safety valve which prevents us from blowing up through other and more dangerous forms of excitement. It does much to keep the body politic in a healthy and happy frame of mind.

When the plaintiff assumed the position of physical instructor and coach to the football team of the Dunkirk High School, he was no exception to the habits and customs which have become a part of the game. His work and the play of his team were matters of keen public interest; victories would be heralded, defeats condemned. The same enthusiasm which welcomed the home-coming of the Roman conqueror now finds expression in the plaudits of the bleachers and the grandstand. The conquered now appear, not in chains, but what may be far worse, amidst ridicule and derision,— the boo-hoos of the crowd.

The Dunkirk High School football team and its coach were, therefore, the subjects of fair comment and criticism in the public press and in sporting circles, and no matter how severe, caustic or ridiculous this criticism was, it afforded no occasion for an action of libel or slander. Every one has a right to comment on matters of public interest and concern, provided he does so fairly and with an honest purpose. Such comments or criticisms are not libelous, however severe in their terms, unless they are written maliciously. Thus, it has been held that books, prints, pictures and statuary publicly exhibited, and the architecture of public buildings, and actors and exhibitors are all the legitimate subjects of newspaper criticism, and such criticism fairly and honestly made is not libelous, however strong the terms of censure may be. (*Hamilton* v. *Eno*, 81 N. Y. 116; *Triggs* v. *Sun Printing & Pub. Assn.*, **179** N. Y. 144; *Bingham* v. *Gaynor*, 203 N. Y. 27, 32; *Cherry*

v. *Des Moines Leader*, 114 Iowa, 298; *Gandia* v. *Pettingill*, 222 U. S. 452; *Bearce* v. *Bass*, 88 Me. 521; Newell, Slander & Libel [4th ed.], p. 519.)

For the present it makes no difference whether we call this right of criticism, which is free for all, and not the special privilege of the press, a qualified privilege (*Gott* v. *Pulsifer*, 122 Mass. 235), or consider it as no libel (*Van Lonkhuyzen* v. *Daily News Co.*, 203 Mich. 571; *Schwarz Bros. Co.* v. *Evening News Pub. Co.*, 84 N. J. L. 486, 491; *Burt* v. *Advertiser Newspaper Co.*, 154 Mass. 238, 242.) The difference in terminology is probably due to the form of pleading. If the public occasion, a matter of public interest, appears upon the face of the complaint, the law of fair comment applies, whereas, if the libelous words (and of course they must be libelous) are alleged in the complaint without the setting or occasion for their utterance, then the fact that they were written as criticism and comment on a matter of public interest must be set forth in the answer as a defense — in the nature of a special privilege. (*Thomas* v. *Bradbury, Agnew & Co., Ltd.*, [1906] 2 K. B. [C. A.] p. 627, at p. 640.)

The articles appearing in the Dunkirk *Evening Observer* are set out in the complaint as follows:

(Action No. 1)

" COACHING SYSTEM CONDEMNED

" FOR TERRIFIC LACINGS GIVEN

" DUNKIRK HIGH FOOTBALL TEAM

" Squad Has Abundance of Latent Ability Which

" Has Not Been Brought Out by Proper Drilling —

" Lack Fundamental Knowledge of Game — Plays

" and Formations Are Antique.

" The terrific drubbing handed the Dunkirk High School football team by Warren on last Saturday afternoon, following hard on the North East setback of the previous week, has swung the vast group of local ' bleacher coaches ' into vocal activity and innumerable remedies

have been suggested as a means of eradicating or at least subjugating some of the more apparent faults displayed by the Maroon eleven.

"Lack of knowledge of the fundamentals of the game, low morale particularly when the 'breaks' are going against them, paucity of plays furnished, antiqueness of plays and formations being used, the lack of a modern coaching system and other causes too numerous to mention have been enumerated by the dopesters in their indignant discussions following last Saturday's slaughter.

"It is interesting to note here that no one offered 'lack of material' as the reason for Dunkirk's dismal showings thus far this season, the concensus of opinion being that the squad this year is the best since the days of Hub Henning, 'Ollie' Weigle and Leo Kornprobst.

"Squad Needs Good Drill

"That the Hoeppner-coached squad is in dire need of a good drill in the rudiments of the game was apparent to even the casual spectator at last Saturday's contest. The work of the local youngsters in catching punts, blocking and charging, and particularly in tackling was slip-shod and demonstrated a lack of knowledge. On an astonishing number of plays the Warren balltoter would be 'tackled' by three or four Dunkirk players before he was finally brought to earth after gaining 10 to 15 yards more than he should have. This dainty manner of tackling was also displayed in the North East game. Three Warren punts were fumbled about by Dunkirk receivers and other kicks were juggled and almost lost. As for the line charging and interference for the ball carrier — nothing much can be said for that.

"No Diversity of Plays

"The fact that the same five or six plays are used constantly throughout the game by Dunkirk makes things much easier for the Maroon's opponents and after the first few minutes the visitors know in exactly what

direction to look for the action.   On some occasions when the team has played Dunkirk several preceding years even the above mentioned few minutes are not necessary. A local quarterback of quite a few seasons back recently made the remark that he believed he could run this ye r's team, as the plays this season looked to be the same ones his outfit used at the high school in the dim and dusky past.

" Perhaps some one will claim that the old plays and formations still work.   They do sometimes — North East used the old Statue of Liberty play here successfully and Warren dug the shoe string play out of its grave and failed only because of a poor pass to the ' sleeper ' near the sidelines.   However, an alert, well-coached team would smother plays of this sort before they were well started.

" TEAM HAS LATENT ABILITY;
         " MUST BE BROUGHT OUT

" The 1928 Dunkirk High School football team has the latent ability to play a brilliant game as they conclusively showed during the first period of the North East game. A flashy, speedy backfield behind a heavy, fast line ripped the opposition to pieces during the first few minutes. When the tide turned and North East scored, the local team's play gradually crumpled into a mere shadow of what it had been.   They just didn't seem to know what to do next.

"Against Warren the Maroon team showed its hidden power but only for very brief spurts.

. " The local followers of the game — and there are many — are wondering why the wealth of material on this year's team is not used to the greatest possible advantage; why the natural ability of many members of the Maroon squad is not polished up and improved upon through a thorough, intelligent and modern coaching system so that when out-of-town schools book the local high, they will be scheduling a game with a feared and

worthy adversary rather than merely arranging a practice workout as has been the case in recent years."

(Action No. 2.)

" DUNKIRK HIGH TROUNCES
" FALCONER 37–0 IN SETUP
" SECOND WEAK TEAM TO FACE MAROON IN TWO WEEKS
" Morrissey, Milner, Domenico Feature.

" Smashing their way through a tissue paper line which the second string penetrated with nearly as great ease as the varsity, Dunkirk High trounced Falconer on the local gridiron Saturday afternoon by a score of 37 to 0.

" The game proved to be the second setup in which the Maroon has engaged for two successive Saturdays. A week ago they took on Westfield and massacred the villagers 52 to 7.

" Were it not for the fact that the local grid season will come to a close Thanksgiving Day it is quite likely to assume that Laona or Arkwright would be scheduled to play the D. H. S. as setups seem to be the Maroon's meat this year. But after the three stinging defeats Coach Hoeppner's charges sustained in their three initial starts, it is fortunate that setups were on the schedule.

" Thanksgiving Day the Maroon engages Jamestown at Jamestown and as the Red and Green has bested several worthy foes this season, one of which, Olean, took Dunkirk's measure, the Maroon will be forced to battle its best if victory is hoped for.

" TEAM HAS SCRAPPY SPIRIT

" Regardless of the outcome of the Dunkirk-Jamestown Turkey Day game the Maroon eleven will be in their fighting. In recent games they have developed a scrappy spirit and if a scrappy spirit was all that is needed to win football games Dunkirk High would come off with colors flying. There is one consolation to the bleacher fans concerning Dunkirk's plays, however. The majority of the plays are so ancient that an up-and-coming coaching

staff like Jamestown's may have never even heard of them and the Red and Green eleven will not be on its guard for antiques. With their scrappy spirit, which from gun to gun is fighting for the glory of the D. H. S., only the fact that Jamestown has a heavier and better drilled team keeps the Maroon from being an even choice in the betting.

" THE FALCONER GAME

" Against Falconer, Morrissey, Milner and Domenico were the local satelites and their ability to go through the line or around the ends gained considerable yardage each time they carried the ball."

Considering first the publication set forth in action No. 2, we find nothing in it of a libelous nature. The words are not defamatory of the plaintiff and are at most a comment that the team badly beat its opponents because they were no match for it. In fact the team was complimented as having developed a scrappy spirit. While the majority of Dunkirk's plays are referred to as being ancient, this is stated as a possible advantage. There may be sarcasm, and perhaps some criticism in this article, but we can find nothing that reflects upon the plaintiff in any way or upon his ability as a coach. The plaintiff has inserted innuendoes, stating that these matters were intended to reflect upon his professional capacity, but an innuendo cannot alter or extend the meaning of the words used. (*Fleischmann* v. *Bennett*, 87 N. Y. 231; *Van Heusen* v. *Argenteau*, 194 N. Y. 309; *Barringer* v. *Sun Printing & Publishing Assn.*, 160 App. Div. 691; *Bearce* v. *Bass*, 88 Me. 521.) The second cause of action should, therefore, have been dismissed, and we answer the question certified to us in the negative — the complaint does not state a cause of action.

A different conclusion has been reached regarding the publication in action No. 1. Some of us are of the opinion that the whole article is a comment upon the playing and the makeup of the football team, and in no

way reflects upon the plaintiff or his ability as a coach. The newspaper was expressing a general feeling of mortification which comes with the defeat of a local football team, and giving vent to those criticisms which attempted to explain the result.

The majority of the court, however, are of the opinion that the article goes further, and may be interpreted or taken as a criticism of the plaintiff's work as physical instructor and coach of the football team and of his professional capacity and intelligence to properly train the players. If the words are susceptible of this meaning, it then becomes a question for the jury to say whether they were used in any such sense. Here again, however, the action and conduct of the plaintiff in drilling his team and his capacity to fill his position are matters of public interest and are subject to fair comment. He is paid out of the public treasury, holds a semi-official position, and trains the boys for public exhibition and contest. Any honest comment or criticism on his ability in these particulars is not libelous. If the facts be truly stated, an opinion of his capacity drawn from these facts, if it be fair and honest, may be given by the newspaper to the public without fear of a damage suit. (Odgers, Libel & Slander [6th ed.], 159; *Hunt* v. *Star Newspaper Co., Ltd.,* [1908] 2 K. B. 309, 317; *Dakhyl* v. *Labouchere,* L. R. [1908] 2 K. B. 325, 329; *Foley* v. *Press Publishing Co.,* 226 App. Div. 535, at p. 546.)

The question arising out of personal attacks or criticism upon the acts and conduct of a public character has been stated by Gatley on Libel and Slander ([2d ed.], p. 387), as follows: " Is the inference the honest expression of the opinion which the defendant held upon the facts truly stated, and warranted by the facts in the sense that a fair-minded man might reasonably draw from them that inference? " (See *Walker & Son, Ltd.,* v. *Hodgson,* [1909] 1 K. B. 239, at p. 253.) If the facts stated by the *Observer* were correct, such, for instance,

as the antiquated plays, ignorance of the game upon the part of the players, lack of discipline and the like, would it not be reasonable to draw the inference that the coach was not thorough and up to date in his work? A criticism or comment of this nature, if fairly and honestly made, even if it reflects upon the plaintiff personally, is not libel.

The complaint, however, goes one step further. We are dealing with the allegations of a complaint, and not with proof after a trial. The plaintiff alleges that this criticism of him and of his work was not fair and was not honest; it was published with actual malice, ill will and spite. If he establishes this allegation, he has made out a cause of action. No comment or criticism, otherwise libelous, is fair or just comment on a matter of public interest if it be made through actual ill will and malice. (*Thomas* v. *Bradbury, Agnew & Co., Ltd., supra;* Gatley on Libel and Slander [2d ed.], p. 370, and cases heretofore cited.) By actual malice is meant " personal spite or ill will, or culpable recklessness or negligence." (*Cherry* v. *Des Moines Leader*, 114 Iowa, 298, 300; *Gott* v. *Pulsifer*, 122 Mass. 235; *Hamilton* v. *Eno*, 81 N. Y. 116.)

Our holding, therefore, upon the publication as alleged in action No. 1 is that if it criticizes or attacks the plaintiff in his competency and capacity as a teacher, and the criticism is reasonably based upon facts truly stated, the article is not libelous unless the plaintiff proves actual malice. The burden is upon him to prove this element of the case.

The order of the Appellate Division in action No. 2 should be reversed and that of the Special Term affirmed, with costs in this court and in the Appellate Division, and the question certified answered in the negative. The order in action No. 1 should be affirmed, with costs, and the question certified answered in the affirmative.

CARDOZO, Ch. J., POUND, KELLOGG and O'BRIEN, JJ., concur; HUBBS, J., dissents in action No. 1; LEHMAN, J., not sitting.

Ordered accordingly.