Noorollah **BAKHSHANDEH**, Plaintiff,

v.

**AMERICAN CYANAMID COMPANY,**
Defendant.

United States District Court
S. D. New York.
Nov. 19, 1962.

Casey, Lane & Mittendorf, New York City, for plaintiff (Samuel M. Lane and Arthur S. Olick, New York City, of counsel).

George J. Conway, New York City, for defendant.

COOPER, District Judge.

The litigation culminating in this trial commenced more than a decade ago. Tried before the court without a jury, this case has spawned a record which assumes rather substantial proportions, consisting of more than 1500 pages of trial testimony as well as scores of exhibits and several lengthy depositions. Yet, the pivotal issues remain relatively simple and free from complexity.

Plaintiff, Noorollah Bakhshandeh, is a citizen and resident of Iran. He seeks to recover damages in the sum of Five Hundred Thousand ($500,000) Dollars from the American Cyanamid Company, alleging that Cyanamid's agent and employee, one Dennis T. Manet, maliciously and falsely uttered certain defamatory statements in Teheran, Iran, regarding plaintiff's practices in the drug and pharmaceutical trade in that country. In addition, Noorollah Bakhshandeh alleges that Cyanamid's agents and employees falsely and maliciously repeated such statements in New York City to various persons (1456–1457)* and thereby injured his reputation and business.

Defendant, a Maine corporation with principal offices in this District, employed Manet in its Lederle Laboratories Division as a sales representative in connec-

---

* Unless otherwise noted, numbers in parentheses refer to pages of the trial transcript.

tion with the sale and commercial promotion of its pharmaceutical products in the Near and Middle East. Plaintiff, during the period from February 1950 to August 31, 1951, acted as Lederle's franchised importer and distributor in Iran under a contract which afforded either party the right to terminate the agreement upon ninety days' notice. In substance, Lederle undertook to supply the pharmaceuticals and plaintiff was to promote and conduct the sale of such products in Iran (Exh. 1). Jurisdiction in this case rests upon the diversity of citizenship provisions of 28 U.S.C.A. ¶ 1332.

Specifically, the complaint alleges that on or about April 28, 1951, the defendant, acting through its employee Manet, maliciously and falsely stated to "various persons" in Teheran, Iran, that "Our agent in Iran (referring to the plaintiff) has promoted Lederle products by bribing Iranian doctors." (Complaint, ¶ 7). Also, the complaint avers that Manet, while in Teheran in April and December 1951, maliciously and falsely stated to "various persons" that "He (plaintiff) is a disreputable merchant; his name was unknown in the drug and pharmaceutical trade in Iran; he sold bottles labeled as Aureomycin which in fact did not contain Aureomycin but were filled with some other harmless drug." (Complaint, ¶ 8).

Plaintiff asserts, in addition, in broad, general terms (¶ 9), that Manet, at Teheran, Iran, maliciously made "numerous false and defamatory statements concerning the plaintiff" which conveyed to them "the impression that the plaintiff lacked a good business reputation in Iran and that he was not an honest and reputable merchant." Further, he complains in paragraph 10 (as amended) that defendant's "officers and/or employees", in New York City, during June and July, 1961, "maliciously and falsely stated * * * that the plaintiff was a dishonest person and that he had bribed physicians and that he had smuggled Aureomycin out of Iran and that he had sold samples and refilled bottles of Aureomycin, and that in general he was a disreputable person." (1456). These, then, are the allegations upon which plaintiff premises this action for slander.

Defendant denies that Manet ever uttered the alleged statements to "various persons" in Teheran and further denies that any of its officers or employees ever uttered such statements in New York. In addition, it alleges by way of defense: (1) failure to state a claim, (2) privilege, and (3) truth. (1453; Exh. HH).

At the close of plaintiff's case, the Court reserved decision on defendant's motions to dismiss for failure to state a claim under Iranian law and for a directed verdict on the ground of lack of proof.[1] (1460–1461).

Manifestly, the initial question for determination is: what law applies? In cases such as this, founded upon diversity of citizenship, a federal district court applies the substantive law of the state wherein it sits, including the rules of conflict of law prevailing in that state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Jaftex Corp. v. Randolph Mills, Inc., 282 F.2d 508 (2d Cir., 1960). New York's rule of conflict of law, therefore, furnishes the guide. It plainly provides that the substantive law applicable to an alleged tort is the *lex locus delicti*, the law of the place where the tort occurred. Loucks v. Standard Oil Co., 224. N.Y. 99, 120 N.E. 198 (1918); Metcalf v. Reynolds, 267 N.Y. 52, 195 N.E. 681 (1935). Accordingly, the substantive law of Iran

---

1. For separate litigation stemming from Bakhshandeh's distributorship franchise in Iran, See Bakhshandeh v. American Cyanamid Co., 286 App.Div. 511, 145 N.Y.S.2d 292 (1st Dept. 1955), aff'd 1 N.Y.2d 744, 152 N.Y.S.2d 291, 135 N.E. 2d 47 (1956). There, the New York courts granted summary judgment in favor of defendant, holding that Cyanamid had the right to terminate the franchise agreement with Bakhshandeh upon ninety days' notice and that it need not accept and fill orders received after notice of termination.

governs the determination of plaintiff's right to recover damages for those statements allegedly uttered by Manet in Teheran in April and December, 1951. With respect to those statements allegedly made in New York City, however, the substantive law of New York applies. Komlos v. Compaigne Nationale Air France, 209 F.2d 436 (2d Cir., 1953); Goodrich on Conflict of Law 189 (2d Ed. 1938).

Although the parties stipulated (Exh. 40) that any action which plaintiff then had would be brought either in the courts of the State of New York or in this Court, that stipulation clearly did not carry with it an agreement to apply the substantive law of New York to the various allegations in this action. Neither can such intention of the parties be spelled out, here, by implication of law. At the trial, Cyanamid strenuously urged the Court that Iranian law should govern the adjudication of any claim based upon statements alleged to have been made in Iran.[2]

■ While the complaint in this case did not plead foreign law, the Court after expressing its belief that the law of Iran applied, afforded plaintiff full and ample opportunity to set forth his proof as to Iranian law (Siegelman v. Cunard White Star, 221 F.2d 189 (2d Cir., 1955)) and, indeed, both sides proceeded to present extensive expert testimony on that subject (499–747; 1374–1402; 960–1208). Plaintiff, of course, retains the burden of proving Iranian law as a fact; and in this regard, the Court advised counsel at the outset that, in the exercise of its discretion, it would not take judicial notice of Iran's laws. See Rule 46, F.R. Civ.P., 28 U.S.C.A.; N.Y.Civ.Pract.Act, ¶ 344–a; Cuba R.R. Co. v. Crosby, 222 U.S. 473, 479, 32 S.Ct. 132, 56 L.Ed. 274 (1912); Dainese v. Hale, 91 U.S. 13, 23 L.Ed. 190 (1875); Telesphor Couture v. Watkins, 162 F.Supp. 727 (E.D.N.Y. 1958).**

Concededly, Manet went to Teheran in April 1951, and again in December 1951. One of his purposes on these trips was to instruct the franchised Lederle distributor and its staff in the promotion of the Lederle line of pharmaceuticals and in the management of the distributorship according "to the methods of business of Lederle, New York." (Exh. LL, p. 12). Manet traveled to several other Near and Middle Eastern Countries before arriving in Teheran on April 16, 1951 (Exh. LL., pp. 13, 75).

A day or two after his arrival, Manet cabled Lederle in New York that wholesalers and retailers "claimed" an "unusual trade inability" on the part of its distributor in Teheran and he therefore would "suggest suspend shipments (of) samples (and) literature pending thorough investigation of facts" (Exh. 11). The cable also indicated that he would advise the Lederle home office further regarding the situation.

Thereafter, as a result of his inquiries and observations, Manet sent back to Lederle's main office in New York certain reports or letters dealing with his findings in regard to the operation of Lederle's Iranian distributorship (Exh. 12–14). Plaintiff's counsel does not dispute that all these communications are deemed "qualifiedly privileged" under both New York and Iranian law and that, as such, their contents cannot constitute either libel or slander in the absence of proof of malice (789–792). See Shapiro v. Health Ins. Plan, 7 N.Y.2d 56, 60–61, 194 N.Y.S.2d 509, 163 N.E.2d 333 (1959); Loewinthan v. Beth David Hospital, 290 N.Y. 188, 190, 48 N.E.2d 319 (1943); Forsythe v. Durham, 270 N.Y. 141, 200 N.E. 674 (1936); Fowles v. Bowen, 30 N.Y. 20 (1864); Seelman, The Law of Libel and Slander in the State of New York 647–48, 653 (1st Ed. 1933).

Thus, the material allegations of the complaint do not rely upon the reports

---

2. Cf. El Hoss Engineering & Transport Co. v. American Independent Oil Co., 183 F.Supp. 394 (S.D.N.Y.1960).

** For further comment on the proof of Iranian law offered in this case, see infra.

or letters as in any way themselves constituting defamation, but, instead, relate only to oral statements allegedly uttered "in the presence and hearing of various persons" in Teheran and in New York City (Complaint, ¶¶ 7–10).

With respect to these alleged oral statements, however, the Court finds itself constrained to conclude that plaintiff clearly failed to sustain his burden of proof.

Both quantitatively and qualitatively, the total proof on the essential elements of the complaint is extremely thin. It rises to the status of prima facie sufficiency, but hardly goes beyond that. Paucity of proof remains, in this case, a pervasive defect.

The allegation that Manet made slanderous statements to persons in Teheran in April and December, 1951, rests almost exclusively on the unsupported testimony of plaintiff and his brother, both of whom were obviously interested witnesses. Neither the nature of their testimony nor their demeanor as witnesses impressed the Court.

Moreover, despite the extended and prolix nature of the trial record, the Court finds it entirely devoid of any sort of convincing corroborative proof with respect to the alleged slanders made in the presence of merchants and doctors in Iran.

The patent inadequacy of plaintiff's proof, both in quality and quantity, appears in perhaps its starkest form in connection with the contention that Manet uttered slanderous statements in the presence of certain merchants and wholesalers in Teheran (180–193). By plaintiff's own testimony, as well as that of his brother Mansoor, it is evident that Noorollah knew the names of these persons and frequently did business with them (180–181, 915–918). Yet, he offered neither their testimony nor any deposition from them with respect to the alleged slanders uttered in their presence.

While Mansoor, supposedly, had also been present at this alleged meeting in Noorollah's "office", none of the numerous letters which Noorollah and Mansoor wrote at this time to their brother, Ata, in New York, in any way mentions such a meeting or the slanders allegedly uttered there in the presence of pharmaceutical merchants and wholesalers (898, 900–905, 376–377).[3]

Similarly, with respect to the assertion that Manet made slanderous statements about him to numerous doctors in Teheran (881–882, 884), plaintiff, significantly, adduces no testimony or deposition whatsoever from any such doctors or other disinterested witnesses.

Nor does any reason appear why the testimony of possible corroborative witnesses in Iran could not have been secured by means of either a closed or open commission. See Rule 28(b), F.R.Civ.P., 28 U.S.C.A.

In this connection, also, Mansoor could not "remember" whether his contemporaneous letters to Ata had ever mentioned anything about slanderous statements to doctors (allegedly made in Mansoor's presence) in Teheran (901).

Plaintiff relies, simply, on Manet's reports and letters to his superiors in New York (Exh. 11–14) as "corroboration" (790–791). Such reliance is misplaced, however, since these reports plainly do not afford sufficient corroborative proof that Manet made the alleged slanderous statements to merchants and doctors in Teheran.

So far as these alleged slanderous statements are concerned, plaintiff falls considerably short of establishing even the basic operative fact of utterance.

In his deposition of May 3, 1953 (Exh. LL), Manet explicitly and categorically denied that he had made any of the alleged defamatory statements to anyone

---

3. This assumes additional importance in view of the fact that Ata remained vitally interested in the relationship between Noorollah and Lederle, and, indeed, functioned as the Noorollah firm's agent in the United States (901–905, 1211, 1214, 1290, 813–814).

in Iran (Exh. LL, pp. 43, 45). In this regard, he also pointed out that to have uttered such alleged defamatory statements against plaintiff to pharmaceutical merchants, doctors, and others in Iran would inevitably have reflected discredit upon Lederle as well, since Noorollah was its distributor (Exh. LL, p. 45).

Manet later modified and qualified his testimony, however, to this extent: In his deposition of February, 1955, Manet testified that when he returned to Teheran in December 1951, he then discovered that plaintiff, who no longer held the Lederle distributorship, nevertheless continued to import and sell Aureomycin capsules in Iran. Manet admittedly advised the Minister of Hygiene (Dr. Hekmat) of this. He also discussed with him the problem of such unauthorized and clandestine importation of Aureomycin capsules (Exh. LL-3, pp. 4-5, 6-7, 9), as well as the problem created by the sale of Aureomycin samples, and reported these discussions back to Lederle's home office in New York. Dr. Hekmat, according to Manet's testimony, had himself actually purchased such samples sold by the Noorollah firm in the market; and he showed them to Manet during the course of their discussions (Exh. LL-3, pp. 13-14).

In addition, Manet stated in this deposition of February, 1955, that he might, perhaps, also have discussed these problems with Khosroshahi, the new Lederle agent, whose interest they vitally affected (Exh. LL-3, p. 15).

The Court can perceive no valid reason, however, why such statements to the Iranian Minister of Health, or to Lederle's new distributor, would not be subject to the same "qualified privilege" which concededly existed with regard to Manet's reports to the company's home office (790-91). See Ashcroft v. Hammond, 197 N.Y. 488, 90 N.E. 1117 (1910); Ormsby v. Douglass, supra, 37 N.Y. 477, 478-479; Seelman, op. cit. supra, 653, 663-64; Gatley on Libel & Slander, 192-226 (5th Ed. 1960).

Moreover, Manet's testimony (Exh. LL-3, pp. 33-34) that a number of persons in Teheran told him that Noorollah re-exported Aureomycin, and that he discussed the situation with them, does not compel the conclusion that Manet himself made the charges on those occasions. Certainly no adequate proof appears in this connection.

The mantle of "qualified privilege" can, of course, be lifted only by a showing of malice or lack of good faith on the part of the person making the statements.

As the New York Court of Appeals stated in Ormsby v. Douglass, supra (37 N.Y. at p. 478):

"The rule is well settled, that a communication, which would otherwise be slanderous and actionable, is privileged, if made in good faith, upon a matter involving an interest or duty of the party making it, though such duty be not strictly legal, but of imperfect obligation, to a person having a corresponding interest or duty."

Similarly, in Loewinthan v. Le Vine, 299 N.Y. 372, at p. 375, 87 N.E.2d 303, at p. 304 (1949), the Court said:

"These defamatory statements were not actionable without proof of malice, because the defendant and his auditors had a common interest in the subject matter of his communications. In other words, he had the protection of a qualified privilege and he was not liable unless he spoke from an improper motive."

See, also, Shapiro v. Health Ins. Plan, 7 N.Y.2d 56, 60-61, 194 N.Y.S.2d 509, 163 N.E.2d 333 (1959); Ashcroft v. Hammond, 197 N.Y. 488, 495, 90 N.E. 1117 (1910); Seelman, op. cit. supra, 663; Gatley, op. cit. supra, 200.

That the burden of proof of malice is on the plaintiff, moreover, can scarcely be doubted. Thus, in Shapiro v. Health Ins. Plan, supra, the Court explicitly declared (7 N.Y.2d at p. 61, 194 N.Y.S.2d at p. 513, 163 N.E.2d at p. 336):

"When defendant's statements are presumptively privileged the rule is

that, in order to render them actionable, it is 'incumbent on the plaintiff to prove that * * * the defendant was actuated by express malice or actual ill will. * * * ' "

See, also, Coloney v. Farrow, 5 App.Div. 607, 39 N.Y.S. 460 (3rd Dept. 1896); Seelman, op. cit. supra, 663; Gatley, op. cit, supra, 200.

■ Malice, it should be recognized, does not mean personal spite or ill-will alone. It may also be defined in terms of recklessness or culpable negligence, that is, "such a wanton and reckless disregard of the rights of another as is ill will's equivalent." Pecue v. West, 233 N.Y. 316, 322–323, 135 N.E. 515, 517 (1922). It means more than mere negligence or want of sound judgment, however. Hoeppner v. Dunkirk Print. Co., 254 N.Y. 95, 106, 172 N.E. 139, 72 A. L.R. 913 (1930). So that if a person made "qualifiedly privileged" statements in good faith, believing them to be true, he would be protected, even though a man of wider experience or greater skill in sifting the evidence might perhaps have hesitated. Nor would the mere fact that the speaker, in part or in whole, relied on hearsay constitute lack of good faith, or malice. Pecue v. West, supra.

Indeed, even if the charge is actually false, where the statements are made in the context of a qualified privilege, the speaker is free from liability unless his conduct resulted from malice. Ashcroft v. Hammond, supra, 197 N.Y. 495, 90 N.E. 1117; Fowles v. Bowen, supra, 30 N.Y. 25; Seelman, op. cit. supra, 648.

■ In the case at bar, plaintiff has clearly failed to sustain his burden of establishing the malice or lack of good faith on the part of Manet which is requisite to removal of the "qualified privilege" protection. Certainly, the Court has no more right to find such malice in Manet without sufficient evidence than it has to find any other fact in plaintiff's favor without sufficient proof. Loewinthan v. Le Vine, supra.

The record discloses no sufficient evidence from which it could be reasonably inferred that Manet did not act in good faith. And, it might well be argued that Manet's contemporaneous cables and letters to the Lederle home office in New York affirmatively tend to indicate that he was simply fulfilling his duties as an agent of the company and acting without malice of any kind. (See Exh. 11–15, M, N, O).

In his initial cable, for example, he states that he will further "investigate" certain claims of "unusual trade inability" on the part of Noorollah made by some wholesalers and retailers (Exh. 11).

Thereafter, Manet conducted further inquiries into the *modus operandi* of Noorollah's firm, visiting, among others, a number of pharmaceutical wholesalers and retailers, the Dean of the Faculty of Medicine, and Noorollah's so-called "office", which contained no mailing facilities, no records, and none of the personnel and equipment of an office (Exh. 12).

In his letter dated April 24, 1951, to Mr. Roland of Lederle's home office, Manet reported on his interview with Dr. Saleh, Dean of the Teheran University Faculty of Medicine, who complained bitterly to him about the exorbitant prices at which Noorollah Bakhshandeh sold Aureomycin to the Iranian government (Exh. N).

Manet became angry upon discovering that Noorollah sold Aureomycin at such exorbitant prices and argued with him about it, as Mansoor's own testimony reveals (865). Further, Noorollah identified Exhibit C, in his own handwriting, as containing the prices he was then charging for Aureomycin products. That these prices are completely exorbitant appears from the comparison in Manet's letter of April 18, 1951 (Exh. 12), which outlines the prices that could have legally been charged as against the prices actually specified in Exhibit C.

At Manet's insistence, Noorollah finally promised that he would establish his prices in accordance with the list in the letter of April 22, 1951, and the enclosures therewith (Exh. 16, 16a, 16b). Noorollah, himself, admitted that though

the Lederle Company repeatedly requested such a list, the April 22nd list was the first he ever sent to it (317, 169; Exh. A). This, to some degree, tends to substantiate Manet's letters describing the difficulties he had in trying to get Noorollah to agree not to charge exorbitant prices for Aureomycin. Significantly, Noorollah also admitted, upon the trial, his conviction in 1952 for violation of the Iranian price control laws (341–343).

In another contemporaneous document, his letter dated April 25, 1951, to Mr. Roland, Manet advised that after practically giving Mansoor an "ultimatum" to produce them, he finally met two young medical students who supposedly acted as part-time detail men, but who left him doubtful about "their knowledge of our products, even Aureomycin" (Exh. O). Manet writes that he attempted to brief them as thoroughly as possible with respect to "both our products and the methods of detailing."

He still remained obviously dissatisfied with Noorollah's operations, however, and, according to this letter of April 25, 1951, had instructed Noorollah "To terminate his present arrangements with the physicians, to maintain the two detail men with full-time activities for Lederle products, to keep a record of his stock, sales and inventories, to communicate such record to you monthly, to issue invoices for each of his sales, and keep the duplicate for my inspection, to have the detail men keep a record of their medical calls, to maintain files of your (Lederle's) and his correspondence, your invoices and his orders, etc., etc." (Exh. O).

Proof of malice being absent, such letters provide at least some indication of Manet's good faith efforts to get Noorollah to conduct the distributorship in a more businesslike manner and in accordance with the Lederle Company's methods.

 The fact that Manet had, years earlier, secured a false medical diploma is, in no sense, sufficient to establish malice, though it clearly must be taken into account and requires the Court to exercise particular care in scrutinizing his testimony. It appears that during the years he worked for Lederle, Manet did not purport to be a physician, but, instead, worked in a supervisory sales capacity, and had been regarded as a conscientious, honest worker, with an excellent reputation for veracity (834, 838, 1474–1476, 1512). While the earlier act of forgery of a medical certificate can in no way be condoned, at the same time it does not vitiate all his subsequent acts.

Moreover, regardless of the limited weight which the Court may afford to Manet's testimony (indeed, even if it were to be discarded entirely), plaintiff retains the burden of proving malice in connection with all qualifiedly privileged statements. See, e. g., Hemmens v. Nelson, 138 N.Y. 517, 34 N.E. 342, 20 L.R. A. 440 (1893); Ormsby v. Douglass, supra. The record here is barren of proof of such malice or lack of good faith.

Manet's testimony, furthermore, is confirmed in a number of respects by plaintiff's own witnesses. For example, Manet indicated that during the original negotiations for the distributorship, Noorollah's brother, Ata, a physician licensed to practice in New York, told him that he personally intended to return to Iran to do the sales work and to supervise the sixteen detail men they would have in the promotion of Lederle products (Exh. LL, pp. 6–7). Ata, in his testimony, admitted that it was possible that he had told Manet, when negotiating for the representation for Noorollah, that he was going to return to Iran to work with his brothers (1433). In point of fact, Ata at no time went to Iran during the entire period that Noorollah held the distributorship (1306).

Similarly, Mansoor testified that he was present in his brother's "office" when Manet went over Noorollah's "records" and that the only records he (Mansoor) saw consisted of a folded-over, manila file containing loose papers (938, 940), confirming Manet's testimony that all he

had been shown by the plaintiff was a folder containing some loose correspondence (Exh. LL, p. 34).

 In any event, it seems clear that plaintiff has failed to sustain his burden of proof with regard to both the slanderous statements allegedly made in the presence of merchants, doctors and others in Teheran, as well as with regard to the issue of malice in connection with reports to Lederle's home office and statements to the Minister of Hygiene.[4]

The Court has discussed, first, the essentially tenuous nature of the proof offered with respect to the foundation-fact of utterance of the alleged slanders. In addition, so far as "qualifiedly privileged" statements are concerned, the Court noted the lack of sufficient or cogent evidence of malice.[5]

 The proof regarding the remedies and particular requirments of Iranian law for a cause of action in slander appears equally unsatisfactory. It seems evident that the 1959 Iranian statute which created a separate civil action for slander had no retrospective effect (544, 580, 743). Further, it is clear from the testimony that, prior to 1959, no specific reference to slander appeared anywhere in the Iranian Civil Code (727–732), although ¶ 269 of the Penal Code provided for civil remedies as well as criminal sanctions in the case of certain kinds of "public" slanders (544–545).

In addition, plaintiff sought to prove that a separate civil action based on general Islamic religious principles, and having less stringent requirements than ¶ 269, also existed in Iran prior to 1959. The testimony of both plaintiff's expert and defendant's expert in this connection left much to be desired and failed to re-solve the issue. On balance, the Court finds itself unpersuaded of the existence of additional remedies, prior to 1959, apart from those provided under ¶ 269 of the Penal Code.

As Mr. Justice Holmes, in Cuba R.R. Co. v. Crosby, 222 U.S. 473 at p. 479, 32 S.Ct. 132, at p. 133 (1912) stated a half-century ago:

"We repeat that the only justification for allowing a party to recover when the cause of action arose in another civilized jurisdiction is a well founded belief that it was a cause of action in that place. The right to recover stands upon that as its necessary foundation. It is part of the plaintiff's case, and if there is reason for doubt he must allege and prove it."

This, plaintiff has failed to do, so far as a separate civil action based on general Islamic religious principles is concerned.

Plaintiff's failure of proof with regard to the facts of utterance and malice, of course, precludes any recovery under the civil remedies made available by ¶ 269 of the Penal Code (547, 1000–1002).

 So far as the alleged slanders in New York are concerned, the proof does not even remotely approach a fair preponderance of the evidence (1944).

Prodigious indeed were the efforts of trial counsel for the contestants. Despite Mr. Lane's ardent advocacy, however, the evidence in this case remains clearly insufficient; and the complaint must be dismissed for failure of proof.

This opinion shall constitute the Court's findings of fact and conclusions of law.[6]

So ordered.

4. It may be noted, too, that Lederle's letter of March 27, 1951, commending Noorollah for "building the business up to its present volume" (Exh. 5) is not necessarily inconsistent with the bases for his subsequent dismissal.

5. New York decisions have been cited as affording some elucidation of the general concept of "qualified privilege." At the trial, plaintiff, as has been previously observed, acknowledge the recognition of this concept under both Iranian and New York law (789–790; 690).

6. The Court's disposition of the evidentiary motions appears in a supplemental memorandum filed herewith.